AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of Oregon

In the Matter of the Search of                )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*    )      Case No.  3:26-mc-00518
                                               )
The premises located at 13682 SE 97th Ave, Unit 13694,   )
Clackamas, OR 97015, as described in Attachment A    )
                                               )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The premises located at 13682 SE 97th Ave, Unit 13694, Clackamas, OR 97015, as described in Attachment A

located in the _____ District of _____Oregon_____ , there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 USC 371, 641 | Theft of Government Property and Conspiracy |

The application is based on these facts:
See affidavit which is attached hereto and incorporated herein by this reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Steven W. King, Special Agent, Army CID
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
____Telephone at _1:04 pm_____.  _____ *(specify reliable electronic means)*.

Date:  ____05/19/2026____

*Youlee Yim You*
_____
*Judge's signature*

City and state:  Portland, Oregon

Youlee Yim You, United States Magistrate Judge
*Printed name and title*

DISTRICT OF OREGON, ss:                    AFFIDAVIT OF STEVEN W. KING

**Affidavit in Support of an Application
Under Rule 41 for a Search Warrant**

I, Steven W. King, being duly sworn, do hereby depose and state as follows:

**Introduction and Agent Background**

1.      I am a Special Agent with the Department of the Army's Criminal Investigation Division (CID), where I have been employed since April 2023. I am currently assigned to the Western Field Office (WEFO), based at Joint Base Lewis McChord, WA (JBLM), focusing on investigations involving crimes against people and property, to include, but not limited to, death, sex crimes, domestic violence, assault, theft, and fraud, while specializing in crime against children.

2.      As part of my duties, I am authorized to conduct investigations for offenses enumerated in Title 18, United States Code, which deal with federal crimes and criminal procedure, and Title 10, United States Code, which consists of the Uniform Code of Military Justice (UCMJ), for offenses which affects the Department of the Army and the Department of Defense. My authority is derived from: (1) Title 10 U.S.C. § 7377, as enacted by Congress, and (2) regulations established by the Secretary of Defense and the Secretary of the Army. As such, I am authorized to investigate violations of the law, where there is an Army interest, or which may be in the interest of the Army.

3.      During my time with CID, I have completed approximately 506 hours of instruction through the Criminal Investigator Training Program (CITP) hosted by the Federal Law Enforcement Training Center (FLETC), receiving training in areas such as physical surveillance, legal statutes, investigative procedures, financial investigations, Fourth Amendment searches, the

**Affidavit of Steven W. King**                                        **Page  1**

drafting of search warrant affidavits, probable cause, etc. I have also completed a 4-month field training program with CID, under the guidance of senior agents.

4.      Previously, for approximately five years, I was employed as an investigator with the Office of the Special Commissioner of Investigation for the New York City School District (SCI), leading and participating in investigations involving criminal, civil, and administrative matters to include public corruption, property crimes, computer crimes, crimes against children, sexual misconduct, fraud, and other offenses. During my tenure with SCI, I received training and status as a New York State Peace Officer and status as a Special Patrolman with the New York City Police Department (NYPD).

2.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises of:

- Unit 13694 located on the premises of the Crown Court Apartments located at 13682 SE 97th Ave, Clackamas, OR 97015

(hereinafter "Premises"), as described in Attachment A hereto, for evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. § 371 – Conspiracy and 18 U.S.C. § 641 – Theft of Government Property (hereinafter "Target Offenses").  As set forth below, I have probable cause to believe that such property and items, as described in Attachment B hereto, including any digital devices or electronic storage media, are currently located at **Unit 13694 located on the premises of the Crown Court Apartments located at 13682 SE 97th Ave, Clackamas, OR 97015.**

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.   The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other

**Affidavit of Steven W. King**                                                                                           **Page  2**

individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

### Target Offenses

4.     I believe there is probable cause to believe that evidence of the following violations will be found in the places to be searched:

- *Title 18, United States Code Section 371* makes it a crime if two or more persons conspire to commit any offense against the United States or to defraud the United States, or any agency thereof in any manner or for any purposes.

- *Title 18, United States Code Section 641* makes it a crime for whoever embezzles, steals, purloins, or knowingly converts to their use or the use of another, or without authority, sells, conveys, or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made.

### Statement of Probable Cause

5.     On October 30, 2025, the Portland Police Bureau (PPB) and CID responded to the area of 1080 SW Alder Street, Portland, OR for a report of theft of property from a vehicle parked in a parking lot. The report was made by Chief Warrant Officer 3 Christopher GATROST, Chief Warrant Officer 2 Clyde PELEKAI, and Staff Sergeant Timothy HOWARD, all of whom were on Title 10/Active Duty orders with the U.S. Army. It was identified that on October 29, 2025, the soldiers had checked into a hotel near the parking lot, after returning a helicopter to the Oregon National Guard. Their rental vehicle, which was loaded with U.S. Army equipment, was parked in

**Affidavit of Steven W. King**                                                                                   **Page  3**

what the soldiers believed was a secure lot. Sometime between October 29 and October 30, 2025, unknown persons broke into the vehicle and removed all property from the vehicle. PPB conducted a crime scene examination of the vehicle, collecting blood that was believed to have been left by the offender caused while breaking the window of the vehicle and a palmprint left by the offender inside and around the vehicle. Given the quantity of property and the distance of the blood trial from the rental vehicle, it is believed that another vehicle was used to transport the stolen property and that multiple persons committed the theft. The following property was reported as stolen:[1]

    a.  3x CSEL Radios- Serial CS30774, CS30776, CS37937 [Sensitive Item]

    b.  1x Getac with case- Serial AV-MSD-RL703V0294

    c.  1x Shout Nano

    d.  1x Sentry ADS-B Tracker

    e.  3x Pelican cases

    f.  3x ALSE flight vest

    g.  3x Flight helmets

    h.  3x Helmet bags

    i.  1x Flight suit

    j.  3x Cold weather flight jackets

    k.  3x Cold Weather Inserts

    l.  3x Gerber

    m.  3x Surefire Lights

    n.  3x Stream Light Head Lamps

    o.  3x Apple iPads

---

[1] The personal property of all three soldiers was also stolen.

**Affidavit of Steven W. King**                                        **Page 4**

p.  1x Life Preserver Unit

q.  1x David Clark headset

r.  3x Survival Knifes

s.  1x Oakley Sunglasses



The above photo depicts the damage to the rental vehicle and the blood trail coming from the vehicle, likely caused by breaking into the vehicle.

6.      On October 30, 2025, CID conducted an interview of GATROST, PELEKAI, and HOWARD. Prior to checking into the hotel on October 29, 2025, they were on a two-day mission, where they were flying a helicopter to Oregon. They were staying in Portland pending a return flight back to Fort Bliss, Texas. While the rental vehicle was parked, property of the U.S. Army was contained in black cases, including three pelican cases, approximately 16 inches by 20 inches in size. GATROST estimated the value of the Army's property to be approximately $40,000.00. The personal property of GATROST, PELEKAI, and HOWARD were also taken. One of the pelican cases was affixed with identifiable stickers and GATROST's name on it, making it easily

**Affidavit of Steven W. King**                                                          **Page  5**

identifiable. Some of the devices that were stolen have tracking capabilities, however the tracking only works if the device is powered on.[2]

7.      On November 4, 2025, CID coordinated with Task Force Sentinel, who conducted a Financial Liability Investigation of Property Loss, and determined that the items were valued at approximately $33,214.13. The property was owned/assigned to the U.S. Army, Hawaii National Guard, and California National Guard. At the time of the theft, all of the property was being used in support of a Title 10 mission to secure the Southern Border.

8.      On November 20, 2025, PPB issued a report regarding its forensic processing of the scene on October 30, 2025. The palm impression located at the scene was identified as being associated with Richard Beeler PATTEN.

9.      On December 17, 2025, PPB attempted to conduct an interview of PATTEN at the Multnomah County Jail, however he declined to make a statement. PATTEN did make a statement alluding to knowing about the property, stating that he would contact PPB after getting released, but he never re-contacted PPB.

10.      On January 3, 2026, CID conducted a follow-up interview with GATROST. GATROST provided that at the time of the theft, the three soldiers were part of the Army's Task Force (TF) Sentinel. TF Sentinel was operating under the umbrella of Operation Southern Border, which was tasked with securing the Southern Border. While TF Sentinel was headquartered out of Fort Bliss, Texas, GATROST, PELEKAI, and HOWARD were based out of El Centro Naval Air Base, in El Centro, California. They were all on Title 10 orders while assigned to the TF Sentinel. As part of Operation Southern Border, TF Sentinel required additional helicopters to complete its mission. As a result, TF Sentinel requested additional helicopters through the Department of

---

[2] Attempts to track these items have been unsuccessful

**Affidavit of Steven W. King**                                                                 **Page 6**

Defense's National Guard Bureau (NGB). In response, the Oregon National Guard, provided a helicopter for use.

11.     GATROST, PELEKAI, and HOWARD, had been tasked with returning the helicopter after use by TF Sentinel. The helicopter was transported from California to Salem, Oregon, at which point GATROST, PELEKAI, and HOWARD, stayed at a hotel in Portland, Oregon, pending a return flight. As part of the helicopter flight from California to Oregon, GATROST, PELEKAI, and HOWARD were required to use the equipment on the helicopter, in addition to the equipment assigned to them by the Army or their respective State National Guard (California and Hawaii), such as their flight suits, radios, tracking devices, etc. The property consisted of a mix of Federal and State assets, however all assigned property was being used in support of a Federal operation/mission.

12.     GATROST noted that some of the items that were stolen—specifically the Combat Survivor Evader Locator (CSEL) Radios and GTAC Computer—were sensitive items. The CSEL radios are typically used in Search and Rescue operations in the event that a helicopter is downed, with a function allowing a helicopter crew to contact DOD personnel around the globe and allowing communications with personnel in sensitive locations. During war time, the radio can also be used to communicate combat actions among DOD personnel. The GTAC Computer contains historical data, such as flight logs/manifests, maintenance records, and other Personally Identifiable Information (PII). The computer is necessary for maintenance and safety of the helicopter and its operations, and the records would show when parts were repaired or need to be replaced.

13.     GATROST also noted that the Shout Nano is used for navigation purposes and does contain a tracking function.

**Affidavit of Steven W. King**                                          **Page  7**

14.    On March 2, 2026, PPB identified a Facebook Marketplace post containing possible helmet stolen. PPB and CID coordinated with GATROST, who was able to confirm that items online belonged to GATROST, PELEKAI, and HOWARD. PPB subsequently obtained a search warrant, issued by the Multnomah County Circuit Court, for the account associated with the Facebook post, which returned to Jameson BRITT.

The above photo depicts a Sentry Receiver. This photo was located on the Facebook Account of BRITT



The above photos depict a pilot helmet, identified by GATROST as being part of his flight crew, located on the Facebook Account of BRITT

**Affidavit of Steven W. King**                                    **Page  8**

15.     On April 29, 2026, CID and PPB conducted an interview of BRITT, who was currently incarcerated at the Clackamas County Jail. During the interview, BRITT appeared to be aware of why law enforcement was making contact with him, alluding to military property that he had previously come across. BRITT stated that he had been staying with a friend since January 2026, identified as having the name Ryan Steven (or some variation of that) (later identified as Steven Ryan REGINATO), with tattoos on his neck, and that they were friends on Facebook. BRITT identified that he was residing with this person at the Crown Court apartments in Clackamas, Oregon, with the apartment number containing 5-7 digits. BRITT further described the apartment as being a partially above/below ground, located on the ground floor of the building. REGINATO was reported to also have a grey BMW. During the interview, BRITT was able to show on a map the possible location of the residence. BRITT further stated that at the time, there was also another person, Kirsten, also residing at the residence, and who appeared to be the girlfriend of REGINATO. BRITT described the residence as being a hoarder situation.

16.     BRITT stated that he had known REGINATO for about a year. BRITT had been staying with REGINATO for a few months, having only left the residence a few weeks prior due to a falling out. BRITT stated that at some point while residing at the residence, REGINATO asked BRITT to use Facebook to sell property that was in REGINATO's possession. BRITT took photos of the property at REGINATO's residence. BRITT was not aware of how REGINATO obtained the items, noting that the property included helmets and headphones, in addition to other items. To his knowledge, BRITT believed that some of the items were still present based upon the last time he was at the residence a few weeks ago, noting that REGINATO and Kirsten had also been using e-Bay to sell the items. BRITT was aware of both REGINATO and Kirsten having multiple computers and phones.

**Affidavit of Steven W. King**                                    **Page 9**

17.     BRITT suggested that key items, such as the helmets, were stored in the apartment's bedroom. BRITT was aware of REGINATO having at least five helmets with the possibility that he sold a helmet already, using cash or exchanging money through CashApp. BRITT also recalls seeing REGINATO with a "scanner" and talking with him about it. BRITT recalls last seeing the scanner about a month ago and noting that it appeared to be a box-like object. BRITT was shown items from Facebook records obtained by PPB and confirmed that it was his account.

18.     On April 29, 2026, CID and PPB were present at the Crown Court Apartments located at 13590 SE 97th Street, Clackamas, Oregon, in an attempt to locate the residence of REGINATO, based upon the description provided by BRITT. Using the information provided by BRITT, agents observed a building—#14—bearing numbers 13676 to 13698. In front of this building was a grey BMW X3 SUV bearing Washington Registration CNM2214, with expired registration dating 8 SEP 2024 and returning to an owner in Battle Ground, Washington. The vehicle was listed as being sold on June 24, 2025, with no title issued. BRITT had described that the residence was located at the below-ground level, located at the corner, away from the main road, which was either unit 13688 or 13694. The back part of the residence was also observable from the Property Management Office, as it is located across the office. Law enforcement observed was what appeared to be unit 13694 cluttered with property, indicative of a hoarding situation.

19.     Kymm SPEAKMAN, Assistant Manager for the property, confirmed that a REGINATO resided at unit 13694. A record check for REGINATO revealed a record with the Department of Motor Vehicles, listing REGINATO as residing at 13682 SE 97th Ave, Unit 13694, Clackamas, Oregon. The photo associated with this record also matches the description of REGINATO as provided by BRITT.

**Affidavit of Steven W. King**                                                                                 **Page 10**



The above photo depicts an image of the apartments in the Crown Court Apartments as listed on the complex's website. The fixtures are similar to the photos of property posted by BRITT on his Facebook account.[3]

20.    On April 29, 2026, CID and PPB identified posts on e-Bay, where an account believed to associated with REGINATO was used to post a "Sentry 1090/UAT ADS-B Dual Receiver" for $660.00, posted on February 9, 2026, and "3 Helicopter Pilot Helmets" for $1,900.00, posted on January 27, 2026. Both listings were labeled as sold. Further review identified that these items were sold to purchasers residing outside of the state of Oregon. Investigators made additional checks for other items reported as being stolen, but were unable to locate any other items on e-Bay or other online marketplaces.

21.    On April 30, 2026, CID conducted a criminal records check for REGINATO, which revealed an arrest in 2015 for Concealed Carry and Possession of a Knife, and an arrest in 2025 for Criminal Trespass, Concealed Carry and Possession of a Knife, and Unlawful Possession of

---

[3] During the investigation, PPB coordinated with management for Crown Court Apartments, who identified that all of the apartments share the same fixtures.

**Affidavit of Steven W. King**                                                    **Page 11**

Methamphetamine.   In October 2025, the Clackamas County Sheriff's Office issued a warrant for

the arrest of REGINATO as it relates to his 2025 arrest.



DMV Photo of Steven Ryan REGINATO

**Electronic Records[4]**

22.      As described above and in Attachment B, this application seeks permission to

search for records that might be found on the Premises, in whatever form they are found. One form

in which the records will likely be found is data stored on a computer's hard drive, on other storage

media, or other digital devices, including cell phones (hereinafter collectively referred to as digital

---

[4]   Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      *Internet*.   The Internet is a global network of digital devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

b.      *Storage medium*.   A storage medium is any physical object upon which data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

**Affidavit of Steven W. King**                                                                                    **Page  12**

devices). Thus, the warrant applied for would authorize the seizure of electronic storage media or the copying of electronically stored information, all under Rule 41(e)(2)(B).

23.     There is probable cause to believe, and I do believe, that records will be stored on a digital device because, based on my knowledge, training, and experience, I know: that digital devices can be used to access Facebook Marketplace, e-bay, and other electronic marketplaces to sell items. These devices may also be used to communicate with others details regarding transactions, such as pricing and locations for shipment. Additionally, digital devices are capable of being used by other parties part of the scheme, to further the offense. For example, the investigation identified that BEELER likely worked with someone to steal the property on October 30, 2025, which subsequently got in the possession of REGINATO. It is possible that BEELER communicated the items that were stolen to REGINATO and facilitated the transfer of property. I am also aware that some digital devices have the ability to track location data. Location data may aid in establishing other persons who was present at the theft from the rental vehicle on October 30, 2025, and places that the offenders may have attempted to physically sell the items.

   a.  Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the Internet.   Electronic files downloaded to a digital device can be stored for years at little or no cost.   Even when files have been deleted, they can be recovered months or years later using forensic tools.   When a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the digital device until it is overwritten by new data.   Therefore, deleted files or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not currently being used by an active file—for

**Affidavit of Steven W. King**                                                        **Page 13**

long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b. Wholly apart from user-generated files, digital devices—in particular, internal hard drives—contain electronic evidence of how a digital device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Digital device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

d. Based on actual inspection of other evidence related to this investigation, such as records and posts from e-bay and Facebook, I am aware that digital devices were used to generate, store, and print documents used in the theft scheme. Thus, there is reason to believe that there is a digital device currently located on the Premises.

24.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant but also for forensic electronic evidence that establishes how digital devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any digital device in the Premises, because, based on my knowledge, training, and experience, I know:

**Affidavit of Steven W. King**                                                    **Page 14**

a. Data on the digital device can provide evidence of a file that was once on the digital device but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the digital device that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a digital device can also indicate who has used or controlled it. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time. Further, forensic evidence on a digital device can show how and when it was accessed or used. Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access to the digital device, its use, and events relating to the offense under investigation. This "timeline" information may tend to either inculpate or exculpate the user of

**Affidavit of Steven W. King**                                                    **Page 15**

the digital device.   Last, forensic evidence on a digital device may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information on a digital device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the digital device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a digital device (e.g., logs indicating that the incriminating information was accessed with a particular program).

c.   A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how digital devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a digital device is evidence may depend on other information stored on the digital device and the application of knowledge about how a digital device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular

**Affidavit of Steven W. King**                                                                 **Page 16**

thing is not present on a digital device. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

    f.   I know that when an individual uses a digital device to commit a crime such as to the embezzlement of government property, the individual's digital device will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain: data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

25.    In most cases, a thorough search of the Premises for information that might be stored on a digital device often requires the seizure of the device and a later, off-site review consistent with the warrant. In lieu of removing a digital device from the Premises, it is sometimes possible to image or copy it. Generally speaking, imaging is the taking of a complete electronic picture of the digital device's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the digital device and to prevent the loss of the data either from accidental or intentional destruction. This is true because:

**Affidavit of Steven W. King**                                                                 **Page 17**

a.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a digital device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine digital devices to obtain evidence.  Digital devices can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Records sought under this warrant could be stored in a variety of formats that may require off-site reviewing with specialized forensic tools.  Similarly, digital devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the digital device off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

26.  Because several people share the Premises as a residence, it is possible that the Premises will contain digital devices that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things

**Affidavit of Steven W. King**                                                      **Page  18**

described in this warrant could be found on any of those digital devices, the warrant applied for would permit the seizure and review of those items as well.

27. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

**Affidavit of Steven W. King** **Page 19**

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. These circumstances include: (1) the device has been turned off, restarted, or inactive; (2) the device has received a remote lock command; (3) too many unsuccessful attempts to unlock the device via biometric authentication are made; (4) when too many hours have passed since the last time the device was unlocked; and (5) when the device has not been unlocked via biometric

authentication for a period of time and the passcode or password has not been entered for a certain amount of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement encounters a locked digital device, the opportunity to unlock the device via biometric authentication exists only for a short time.

f. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock digital devices found during the search of the Premises are not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric authentication, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such

**Affidavit of Steven W. King**　　　　　　　　　　　　　　　　　　**Page 21**

as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner discussed above to attempt to identify the device's user(s) and unlock the device(s) via biometric authentication. Based on these facts and my training and experience, it is likely that **Steven Ryan REGINATO** is one user/are users of the device(s) and thus that his physical characteristics are among those that are able to unlock the device.

28.     I therefore request that the Court authorize law enforcement to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the Premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

### Nature of Examination

29.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I apply would permit seizing, imaging, or otherwise copying digital devices that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the device or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire device, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

**Affidavit of Steven W. King**                                                                                    **Page 22**

30.     The government shall complete this review within 365 days of the date of execution of the warrant.   If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

31.     If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the digital device do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.   Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

32.     If an examination is conducted, and the computer and storage media do not contain any data falling within the ambit of the warrant, the government will return the computer and storage media to its owner within a reasonable period of time following the search and will seal any image of the computer and storage media, absent further authorization from the Court.

33.     If a computer or storage media contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain that computer or storage media as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the computer and storage media and/or the data contained therein.

34.     The government will retain a forensic image of the digital device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims

**Affidavit of Steven W. King**                                                     **Page  23**

where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

35.     The government has not made the following prior efforts in other judicial fora to obtain evidence sought under the warrant.

**Conclusion**

36.     Based on the foregoing, I have probable cause to believe, and I do believe, that **Steven Ryan REGINATO** committed the Target Offenses, and that contraband, evidence, fruits, and instrumentalities of that/those offense(s), as described above and in Attachment B, are presently located at the Premises, which is described above and in Attachment A.  I therefore request that the Court issue a warrant authorizing a search of the Premises described in Attachment A for the items listed in Attachment B and the seizure and examination of any such items found.

37.     Prior to being submitted to the Court, this affidavit, the accompanying application, and the requested search warrant were all reviewed by Assistant United States Attorney (AUSA) Julia Jarrett. I was informed that it is AUSA Jarrett's opinion that the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

*By phone pursuant to Fed. R. Crim. P. 4.1*
STEVEN W. KING
Special Agent, Army CID

Sworn in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone at
1:04 pm          on   May 19, 2026         .

_____
HONORABLE YOULEE YIM YOU
United States Magistrate Judge

**Affidavit of Steven W. King**                                              **Page  24**

**ATTACHMENT A**

**Property to Be Searched**

The property to be searched is Unit 13694 located on the premises of the Crown Court Apartments located at 13682 SE 97th Ave, Clackamas, OR 97015, a ground floor apartment bearing the number 13694 on the door, further described in the photos below.

For physical locations, this includes all areas within and surrounding the primary residence/location, including all rooms, storage areas, containers, patios, secure locations (such as safes), and any persons located within said property or within the residence/location.



The apartment is located at/near the pin, as shown in the photo above.

**Attachment A**                                                                                       **Page 1**



The above photos depicts the side apartment, located on the lower right side of the building. The

Carport number listed in the photos are 75 and 76.



The above photo depicts the rear of the building/apartment, located to the left.

**Attachment A**                                                                                                    **Page 2**



The above photos depicts the residence, as taken from the stairwell, leading down to the apartment. The apartment is partially below the ground, from the front, but from the rear is at grade level.

**ATTACHMENT B**

**Items to Be Seized**

The items to be searched for, seized, and examined, are those items on the premises located at Unit 13694 located on the premises of the Crown Court Apartments located at 13682 SE 97th Ave, Clackamas, OR 97015, referenced in Attachment A, that contain evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. § 371 – Conspiracy and 18 U.S.C. § 641 - Theft of Government Property.  The items to be seized cover the period of October 29, 2025, through the date of the execution of the search warrant.

1.      The items referenced above to be searched for, seized, and examined are as follows:

      a.  CSEL Radios bearing Serial Number CS30774, CS30776, CS37937

      b.  Getac with case bearing Serial Number AV-MSD-RL703V0294

      c.  Shout Nano

      d.  Sentry ADS-B Tracker

      e.  Pelican Cases

      f.  ALSE flight vest

      g.  Flight helmets

      h.  Helmet bags

      i.  Flight suit

      j.  Cold weather flight jackets

      k.  Cold Weather Inserts

      l.  Gerber

**Attachment B**                                                    **Page 1**

m. Surefire Lights

n. Stream Light Head Lamps

o. Apple iPads identified as being associated with the U.S. Government, U.S. Army, Hawaii National Guard, California National Guard, Oregon National Guard, or Christopher Gatrost, Clyde Pelekai, and/or Timothy Howard.

p. Life Preserver Unit

q. David Clark headset

r. Survival Knifes

s. Items marked as Property of the United States Government or marked as being property of any entity of the United States Government.

t. Records and/or correspondences, whether in electronic or in paper format, related to e-bay transactions, Facebook, Facebook Marketplace, pawn shops, and/or any other commercial marketplace used to buy and sell goods.

u. Papers, records, documents, files, notes, memos, mail, or other materials representing residency, ownership, occupancy, dominion, or control of the premises referenced above and described in Attachment A.

v. Records or keys showing possession of safe deposit boxes, safes, storage units, and any other type of storage areas, including passwords and/or access codes for access during the searches.

w. Correspondence and communications, whether electronic or in paper format, regarding the possession and/or sale of government property.

**Attachment B**                                                                                   **Page 2**

x. Information pertaining to transactions with and/or correspondence with the U.S. Government and related to the offenses set forth above.

y. Computers, storage media, or digital devices used as a means to commit the violations described above, including (downloading confidential materials without authorization in violation of 18 U.S.C. § 1030(a)(2).) The government may search these device without further authorization for the following items:

  i. Assigned phone number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

  ii. Stored list of recent received, sent, and missed calls;

  iii. Stored contact information;

  iv. Stored photographs, videos, addresses, calendar notes, notes, map history, or documents/files of or related to U.S. Government/Military Property, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data or other metadata associated with those photographs, videos, and other items;

  v. Stored text messages related to the aforementioned crimes of investigation, including Apple iMessages, Blackberry Messenger messages, or other similar messaging services where the data is stored on the telephone;

  vi. Stored emails related to the aforementioned crimes of investigation;

  vii. Stored voicemails related to the aforementioned crimes of investigation;

  viii. Stored web browsing history related to the aforementioned crimes of investigation;

**Attachment B**                                                                 **Page 3**

ix.  Stored social media content/history related to the aforementioned crimes of investigation;

x.  Stored banking or money transfer history, including application based money transfer data/history (i.e. Venmo or CashApp account data/history); and

xi.  Stored location data, including from any map applications on the cell phone.

xii.  Personally Identifiable Information (PII) of members of the U.S. Armed Forces to include flight logs, flight manifests, maintenance records, and other records related to helicopter operations and missions.

2.      As used in this attachment, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.  The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

3.      For any computer or storage medium whose seizure is otherwise authorized by this warrant and any computer, storage medium, or digital device that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter "Computer")

**Attachment B**                                                                                  **Page 4**

a.  Evidence of who used, owned, or controlled the Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

b.  Evidence of software that would allow others to control the Computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c.  Evidence of the lack of such malicious software.

d.  Evidence indicating how and when the Computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the Computer user.

e.  Evidence indicating the Computer user's state of mind as it relates to the crime under investigation.

f.  Evidence of the attachment to the Computer of other storage devices or similar containers for electronic evidence.

g.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Computer.

h.  Evidence of the times the Computer was used.

i.  Passwords, encryption keys, and other access devices that may be necessary to access the Computer.

**Attachment B**                                                    **Page 5**

j.  Documentation and manuals that may be necessary to access the Computer or to conduct a forensic examination of the Computer.

k.  Records of or information about Internet Protocol addresses used by the Computer.

l.  Records of or information about the Computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

m.  Contextual information necessary to understand the evidence described in this attachment.

4.     During the execution of the search of the Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the Premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**Search Procedure**

5.     The search for data capable of being read, stored, or interpreted by a computer or storage device, may require authorities to employ techniques, including imaging any computer or storage media and computer-assisted scans and searches of the computers and storage media, that might expose many parts of the computer to human inspection in order to determine whether it constitutes evidence as described by the warrant.

**Attachment B**                                                                    **Page 6**

6.    The government shall complete this review within 365 days of the date of execution of the warrant.  If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

7.    If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the computer and storage media do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

8.    If an examination is conducted, and the computer and storage media do not contain any data falling within the ambit of the warrant, the government will return the computer and storage media to its owner within a reasonable period of time following the search and will seal any image of the computer and storage media, absent further authorization from the Court.

9.    If a computer or storage media contains evidence, fruits, contraband, or is an instrumentality of a crime, the government may retain that computer or storage media as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the computer and storage media and/or the data contained therein.

10.    The government will retain a forensic image of the computer and storage media for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence

**Attachment B**                                                      **Page 7**

claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.